# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

In the Matter of the Detention of:

C.R.,

                                    Appellant.

No. 57439-0-II

UNPUBLISHED OPINION

GLASGOW, C.J. — After CR sprayed her father in the face with pepper spray, the State charged her with second degree assault. CR was found incompetent to stand trial. Medical professionals then petitioned for a 180-day involuntary commitment order, which the superior court granted.

CR appeals, arguing that there was not sufficient evidence to support the superior court's conclusions that she was gravely disabled, that she committed second degree assault, and that she was substantially likely to commit similar acts upon release. We affirm.

FACTS

I. BACKGROUND

In 2021, CR pepper sprayed her father in the face. As a result of the incident, the State charged CR with second degree assault.[1]

---

[1] CR was also charged with another count of second degree assault and two counts of violating a protection order. The State later dismissed these charges, and they are not relevant to this appeal.

CR was found incompetent to stand trial. In August 2022, after CR underwent competency restoration, the superior court found that CR was still incompetent and "unlikely to regain competency in a reasonable period of time." Clerk's Papers (CP) at 1. The superior court dismissed CR's charges. The superior court then ordered a short-term commitment to evaluate her for the purpose of filing a civil commitment petition.

## II. INVOLUNTARY TREATMENT PETITION

A physician and a mental health professional ultimately petitioned for CR to undergo 180 days of involuntary inpatient treatment. They alleged that CR was gravely disabled. They also alleged that she had "committed acts constituting a felony, and as a result of a behavioral health disorder," she presented "a substantial likelihood of repeating similar acts," and that these acts constituted "a violent offense." CP at 6. Finally, they alleged that CR was "not ready for a less restrictive placement" in the community. CP at 7 (emphasis omitted).

The physician and mental health professional submitted a sworn declaration supporting the petition. They listed CR's diagnosis as "[u]nspecified schizophrenia spectrum and other psychotic disorder." CP at 16. They declared that, since 2017, CR had engaged with crisis intervention services at a hospital 20 times and had been involuntarily committed 3 times.

During the most recent competency restoration period, CR was "able to navigate the ward effectively and attend to daily activities without significant prompting by staff." CP at 13. But recent forensic evaluations "demonstrated ongoing psychiatric symptoms in the context of inconsistent medication adherence." CP at 10. CR displayed "a range of behaviors consistent with a severe psychotic episode," including "reactivity to delusional beliefs, escape attempts," and "verbal outbursts that [provoked] peers." *Id.* She sometimes became "'assaultive or threatening,'"

and as a result, she had to be "'placed in seclusion or restraints on multiple occasions.'" *Id.* She also received multiple visits from the psychiatric emergency response team.

Most "attempts to . . . evaluate her more directly" were hampered by her refusal to communicate or "by interference from delusional content." *Id.* She participated "in a limited fashion with her treatment," following "staff direction and redirection adequately some of the time." CP at 15-16. She was "under a forced medication order," and while she remained "compliant with medication," she had "not yet achieved an optimal or responsive therapeutic dose." CP at 10, 16.

The declaration described CR's most recent mental status examination, which took place 3 days before the petition was filed. The evaluator found CR to be "oriented at a basic level to person, place[,] and time." CP at 13. CR "appeared able to maintain a general awareness of the interview's purpose and communicate effectively for approximately" 35 minutes, despite going on some "delusional tangents." CP at 14. But CR said "her antipsychotic medications [were] unnecessary, and that she [needed] to return to" the medication she took when she lived in the community. *Id.*

The evaluator predicted that CR's "inability to manage emotions during [delusional] episodes . . . would likely lead to medication [noncompliance] and further interactions with law enforcement, arrests, and/or" recommitment. CP at 15. While the evaluator noted that CR had "not demonstrated any injurious, assaultive behavior during" her most recent commitment, "her behaviors on the ward [placed] her at great risk [of] retaliation or accidental injury." *Id.*

III. Hearing on Involuntary Treatment Petition

A.      Testimony About Grave Disability

At a hearing on the involuntary treatment petition, the petitioning mental health professional testified that CR had "a fixed delusion regarding sex trafficking and the belief that she is god." 2 Verbatim Rep. of Proc. (VRP) at 3. He said that CR's symptoms rendered her "frequently unable to participate in treatment," and that her "high level of agitation" required hospital staff to use "seclusion and restraints." 2 VRP at 3, 5.

CR, however, denied that her statements about sex trafficking were delusional. She testified that there was sex trafficking at the Pierce County Jail. She said she had "spoken to [her] brother about it and . . . spoken to [her] ex about it, and they verified it." 1 VRP at 11. She said she had been warned that people would call her psychotic for talking about the sex trafficking, and she denied that she was psychotic or schizophrenic. She explained that before her arrest, she was planning to adopt a 16-year-old girl who was being trafficked. After she told two friends about the situation, she saw fake Facebook profiles for those friends. "And the things that happened within Pierce County Jail matched the fake profiles." 1 VRP at 17. CR also said there were false allegations that she was involved with Jeffrey Epstein.

When asked if she suffered from a psychotic disorder, CR testified that there were "varying opinions from doctors" at the hospital where she was committed. 1 VRP at 13. CR incorrectly stated she was "already deemed competent off medication." 1 VRP at 18. But she acknowledged she had "some mental issues right now." 1 VRP at 13. She then began discussing a religious television program, where people "find the spirit of mental illness, declare you have the mind of Christ, you have the mind of Christ, you're not mentally ill." 1 VRP at 14.

4

The mental health professional opined that CR lacked insight into her condition, explaining that she associated her behavior with "just having anxiety." 2 VRP at 4. And he testified that CR had impaired judgment because she had denied needing medication and had to be the subject of a forced medication order. He predicted that CR "would not be able to meet her basic health and safety needs" in the community because "if released," she would "not take her medications, which would result in decompensation." *Id.* He added that when CR "is decompensated, she reaches a manic state" that puts her "at risk of harm." *Id.*

In contrast, CR testified that she would seek treatment if released. CR said that if a provider of her choosing prescribed her medication, including antipsychotic medication, she would take it. CR also described a postrelease plan for housing, accessing medical care, and supporting herself financially. She said she would first live with her brother in Tacoma. In Tacoma, she would go to a clinic as well as a private psychiatrist, whom she had seen before and whose opinion she trusted. Then, she would live with her grandfather in Morton, although when she lived with him two years ago, she "walked out in the snow" to a friend three houses down because she did not like the way her grandfather treated her. 1 VRP at 15. In Morton, she would go to "a small clinic" she had "visited one time." 1 VRP at 12. Separately, CR mentioned attending "an online counseling program . . . specifically for dancers." 1 VRP at 15. And CR said she had a counselor through a church who knew about the incident leading to her arrest.

Describing her financial resources, CR said she had money in savings, a car, and the ability to teach ballet or work at a restaurant that had previously employed her. She added that her "husband . . . makes good money" and that her grandfather had offered to help support her. 1 VRP at 10.

B.      Testimony About the Underlying Offense

CR's father testified about the incident that led to CR's arrest. He said CR went to his home and demanded his car keys. He thought CR "appeared manic." 2 VRP at 2. When he refused to give CR the keys, she "sprayed his face with what he believed to be pepper spray," causing him to temporarily lose the ability to see. 2 VRP at 1. He "did not seek medical treatment but did rinse his eyes with milk." 2 VRP at 1-2.

The mental health professional testified that when CR committed the offense, she was "manic . . . and had a delusion about sex trafficking." 2 VRP at 6. He said that CR "still [experienced] these exact symptoms." *Id.* And he said that "in reviewing both [CR's] criminal history and her mental health history," he observed that "the two records [correlated] with one another." *Id.* He thus opined that CR committed second degree assault as "the result of her behavioral health disorder." *Id.*

## IV. SUPERIOR COURT COMMISSIONER'S RULING

The commissioner ordered 180 days of involuntary inpatient treatment on 2 separate grounds: that CR was gravely disabled, and that CR committed acts constituting second degree assault and was substantially likely to repeat similar acts.

A.      Grave Disability

The commissioner found that CR had "a number of prior community contacts," involuntary treatment evaluations, and emergency room visits "related to her condition." CP at 23. CR did not believe she had "any condition other than anxiety," in spite of the fact that her symptoms were "not consistent with that diagnosis." *Id.* During her treatment, CR had needed restraints, and the psychiatric emergency response team had become involved in her care because of her level of

agitation. Additionally, forced "medication orders [had] been required, most recently a few weeks" before the ruling, and CR had only recently begun responding to the medication. *Id.*

The commissioner found that CR had "a fixed delusion concerning sex trafficking in Pierce County," as well as "religious fixations." *Id.* She was "unable to suppress her constant discussion of her beliefs." *Id.* Moreover, because of her delusion, CR was unable "to process information in a rational manner." *Id.* The commissioner noted that the mental health professional did not believe she would take medication or seek treatment in the community because she did "not recognize her condition." *Id.* Moreover, the mental health professional believed that if CR were "released without condition, . . . she would decompensate again." *Id.* And if CR "were to experience another manic event," she would not be able to "meet basic needs" due to preoccupation with her delusion. *Id.* To be ready for a less restrictive alternative to commitment, CR needed to show a "consistent pattern of compliance with" her medication. CP at 23-24.

The commissioner thus concluded that CR was gravely disabled because, due to a behavioral health disorder, she manifested "severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volition control," and because she was "not receiving such care as is essential for health and safety." CP at 23.

B.     Likelihood of Repeating Similar Acts

The commissioner found that CR pepper sprayed her father in the face while she was "manic" and "acting more and more irrationally." *Id.* As a result, CR's father could not see. "He used milk to treat himself per 911 direction." *Id.* The commissioner thus concluded that CR committed second degree assault and that her acts constituted a violent offense.

7

The commissioner also found that when CR became preoccupied, she experienced "an urgent need to take action and [became] aggressive and assaultive." *Id.* The commissioner found that if CR were "to experience another manic event," she "would engage in activities similar to criminal acts." *Id.* And the commissioner found "a correlation between her psychiatric instability and the number of assaults" in her records. *Id.* Therefore, the commissioner concluded that "as a result of a behavioral health disorder," CR presented "a substantial likelihood of repeating similar acts." CP at 22.

CR appeals the commissioner's order.

## ANALYSIS

When reviewing a commissioner's decision on involuntary commitment, we consider whether substantial evidence supports the commissioner's findings of fact and whether those findings of fact support the commissioner's conclusions of law and judgment. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022). "'Substantial evidence' is the quantum of evidence sufficient to persuade a fair-minded person.'" *Id.* (quoting *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015)).

We "view the evidence in the light most favorable to the petitioner," and we do not disturb decisions "regarding witness credibility or the persuasiveness of the evidence." *Id.* Additionally, we view unchallenged findings of fact as verities on appeal. *In re Det. of L.S.*, 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022).

## I. GRAVE DISABILITY

CR argues that substantial evidence does not support the commissioner's findings of fact about her grave disability and that those findings do not support the conclusion that she was gravely

disabled. CR points out that she described where she would live, work, and receive treatment. We disagree.

The State may involuntarily commit a person if a petitioner proves by clear, cogent, and convincing evidence that the person "is gravely disabled." Former RCW 71.05.280(4) (2022); *see also In re Det. of R.H.*, 178 Wn. App. 941, 945-46, 316 P.3d 535 (2014). One definition of grave disability states that a person is gravely disabled if, "as a result of a behavioral health disorder," they manifest "severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [their] actions and [they are] not receiving such care as is essential for [their] health or safety." Former RCW 71.05.020(24)(b) (2022). This definition permits the State to involuntarily treat "patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit 'rapid deterioration in their ability to function independently.'" *In re Det. of LaBelle*, 107 Wn.2d 196, 206, 728 P.2d 138 (1986) (quoting Mary L. Durham & John Q. La Fond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment*, 3 YALE L. & POL'Y REV. 395, 410 (1985)). Thus, it "allows intervention before a mentally ill person decompensates and provides for continuity of care." *A.F.*, 20 Wn. App. 2d at 127.

When a petitioner seeks to prove that a person is gravely disabled under former RCW 71.05.020(24)(b), they must present "recent proof of significant loss of cognitive or volitional control." *LaBelle*, 107 Wn.2d at 208. They must also show "a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for [their] health or safety." *Id.* Finally, the petitioner must demonstrate "that the individual is *unable*,

9

because of severe deterioration of mental functioning, to make a rational decision with respect to [their] need for treatment." *Id.*

For example, in *In re Det. of A.M.*, we held that a person was gravely disabled under this definition. 17 Wn. App. 2d 321, 336, 487 P.3d 531 (2021). We reasoned that the person's "recent felony harassment of a stranger," "his health concerns that impacted his ability to feed himself, and his continuing agitated and angry state, which were all due to his persistent delusional beliefs," demonstrated "recent significant loss of cognitive or volitional control." *Id.* at 335-36. And we reasoned that, along with having "'a history of noncompliance with medication in the community,'" the person "had no insight into his mental illness, did not believe that he was mentally ill, and did not believe that he needed any medication," so he "would not receive care that is essential for his health or safety if released." *Id.* at 336.

Here, the commissioner found that CR's behavior demonstrated a significant loss of cognitive and volitional control. The commissioner also found that CR would not receive care essential for her health and safety if released. Finally, the commissioner found CR did not "recognize her condition" and her delusional beliefs prevented her from processing information in a rational manner and making rational decisions about her care. CP at 23.

Substantial evidence supports these findings. It is true that unlike the person in *A.M.*, CR acknowledged at least "some mental issues," and she said she would take antipsychotic medications if a provider in the community prescribed them. 1 VRP at 13. But despite her diagnosis, CR denied that she had a form of schizophrenia and that her statements about sex trafficking were delusional. Moreover, the petitioners declared that "interference from delusional content" hampered attempts to evaluate CR and that CR participated "in a limited fashion with her

treatment." CP at 10, 15. Similarly, the mental health professional testified that CR's symptoms rendered her "frequently unable to participate in treatment." 2 VRP at 5. The petitioners declared that CR had "inconsistent medication adherence" and predicted that she would not take her medication if released before receiving more treatment. CP at 10. And the mental health professional testified that without medication, CR would decompensate. The commissioner relied on these assessments in their findings, and we do not reweigh the persuasiveness of the evidence. *A.F.*, 20 Wn. App. 2d at 125.

Like the person facing commitment in *A.M.*, CR's delusional beliefs caused her to become "aggressive and assaultive." CP at 23. She was hospitalized after attacking another person and she displayed considerable agitation in the hospital, needing restraints as well as care from the psychiatric emergency response team. And like the person in *A.M.*, CR had a history of noncompliance with medication.

In sum, the commissioner's findings of fact, which are supported by substantial evidence, show that CR recently suffered a loss of cognitive or volitional control because of a behavioral health disorder and that she would not receive care essential for her health and safety if released into the community. These findings support the conclusion that CR was gravely disabled.

We affirm CR's commitment on the basis of grave disability.

## II. ACTS CONSTITUTING A FELONY

CR argues that petitioners presented insufficient evidence to prove that she committed second degree assault and was substantially likely to commit similar acts if released. This basis for commitment allows the State to commit her for 180 days rather than 90. *See* RCW 71.05.320(1)(a), (1)(c).

11

The State may involuntarily commit a person if a petitioner proves by clear, cogent, and convincing evidence that the person has "been determined to be incompetent," "criminal charges have been dismissed," the person has "committed acts constituting a felony, and as a result of a behavioral health disorder," the person presents "a substantial likelihood of repeating similar acts." Former RCW 71.05.280(3); *see also A.M.*, 17 Wn. App. 2d at 330. Clear, cogent, and convincing evidence "is a quantum of proof that is more than a preponderance of the evidence, but less than what is needed to establish proof beyond a reasonable doubt." *In re Est. of Barnes* 185 Wn.2d 1, 10 n.5, 367 P.3d 580 (2016).

A.      Second Degree Assault

CR argues that substantial evidence does not support the commissioner's finding that she committed second degree assault. Specifically, CR argues that she did not inflict substantial bodily harm, pointing out that CR's father "was able to retrieve milk to wash out his eyes" so "any inability to see was of very short duration." Br. of Appellant at 17. And CR argues that if we were to hold that second degree assault encompasses "spraying a substance resulting in a temporary inability to see," our holding "would lead to absurd results," such as second degree assault convictions for "blowing smoke or splashing water." *Id.* at 17-18. We disagree.

A person commits second degree assault when, under circumstances not amounting to first degree assault, they intentionally assault another person "and thereby recklessly [inflict] substantial bodily harm." 9A.36.021(1)(a). "'Substantial bodily harm'" includes "bodily injury . . . which causes a temporary but substantial loss or impairment of the function of any bodily part or organ." RCW 9A.04.110(4)(b). The "term 'substantial,' as used in" the second degree assault statute, "signifies a degree of harm that is . . . 'considerable in amount, value, or worth.'" *State v.*

*McKague*, 172 Wn.2d 802, 806, 262 P.3d 1225 (2011) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (2002)). The term "necessarily requires a showing greater than an injury merely having some existence." *Id.*

In proving that a person "committed acts constituting a felony" under former RCW 71.05.280(3), a petitioner need not "show intent, willfulness, or state of mind as an element of the crime." Former RCW 71.05.280(3)(a). Additionally, if "the charge underlying the finding of incompetence is for a felony classified as violent under RCW 9.94A.030," the commissioner must "determine whether the acts the person committed constitute a violent offense under" that statute. Former RCW 71.05.280(3)(b).

Here, CR committed acts constituting second degree assault, a violent offense. RCW 9.94A.030(58)(a)(viii).[2] The commissioner found that CR pepper sprayed her father in the face, and CR does not challenge this finding. As a result of CR's actions, CR's father briefly lost eyesight. While "temporary," this loss constituted a "substantial loss . . . of the function of" his eyes because he was completely unable to use them. RCW 9A.04.110(4)(b). The petitioners did not need to prove that CR acted intentionally and recklessly because they were not required to show "state of mind as an element of the crime." Former RCW 71.05.280(3)(a). And the fact that CR's father was able to treat himself with milk is irrelevant: the statutory definition of substantial bodily harm does not require the harm to last a long time or necessitate treatment from a medical professional.

CR argues that this interpretation of RCW 9A.36.021 would make a person guilty of committing second degree assault for blowing cigarette smoke or splashing water in another

---

[2] We cite to the current statute as the relevant definitions and language have not changed.

person's face. But her argument does not acknowledge the fact that cigarette smoke dissipates by itself almost instantly, and a splash of water causes momentary stinging at most. In contrast, "[p]epper spray can cause severe irritation of the eyes, skin, and mucous membranes, resulting in temporary blindness, cough and shortness of breath, chest pain, and skin rashes, blisters, or burns." Alexandra Chen, *Chemical Weapons and Their Unforeseen Impact on Health and the Environment*, 12 SEATTLE J. TECH., ENV'T & INNOVATION L. 1, 5 (2022).

B.      Likelihood of Committing Similar Acts

CR argues the State failed to adequately prove that she "presents a substantial likelihood of committing similar acts to the originally charged offense." Br. of Appellant at 22. We disagree.

The commissioner found that when CR became preoccupied with her delusions, she became "aggressive and assaultive." CP at 23. The commissioner also found a correlation between CR's past behavioral health episodes and assaults. Substantial evidence supports these findings. The sworn declaration contained an evaluator's prediction that CR's "inability to manage emotions during [delusional] episodes . . . would likely lead to medication non-compliance," more interactions with police, and more arrests. CP at 15. The mental health professional testified that CR was still experiencing the "exact symptoms" she experienced when she committed second degree assault. 2 VRP at 6. And the mental health professional noted the correlation between CR's conviction history and mental health history, and he testified that CR's delusions cause her to behave aggressively toward others when she stops taking medication to treat her behavioral health condition.

No. 57439-0-II

The commissioner's findings that CR's delusions tended to make her assaultive in turn support the ultimate conclusion that, as a result of CR's behavioral health disorder, CR was substantially likely to repeat acts similar to second degree assault under former RCW 71.05.280(3).

We affirm CR's commitment on the basis that she committed second degree assault and was substantially likely to commit similar acts if released.

CONCLUSION

We affirm the commissioner's order committing CR for 180 days of involuntary treatment.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Maxa, J.

Lee, J.